**Affirmed and Opinion filed March 8, 2012.**



In The

# Fourteenth Court of Appeals
_____

### NO. 14-11-00301-CV
_____

**8100 NORTH FREEWAY, LTD., Appellant**

**V.**

**THE CITY OF HOUSTON, Appellee**

---

**On Appeal from the 281st District Court**
**Harris County, Texas**
**Trial Court Cause No. 2008-40090**

---

## OPINION

Appellant, 8100 North Freeway, Ltd. ("8100"), appeals from the trial court's granting of a permanent injunction enjoining 8100 from operating an adult arcade without a permit. Finding no error, we affirm.

### I. THE ADULT ARCADE REGULATIONS

Chapter 243 of the Texas Local Government Code authorizes municipalities such as the City of Houston ("Houston") to regulate sexually-oriented businesses ("SOB"). *See* TEX. LOC. GOV'T CODE ANN. § 243.003 (West 2005). The Local Government Code defines an SOB as:

[A] sex parlor, nude studio, modeling studio, love parlor, adult bookstore, adult movie theater, adult video arcade, adult movie arcade, adult video store, adult motel, or other commercial enterprise the primary business of which is the offering of a service or the selling, renting, or exhibiting of devices or any other items intended to provide sexual stimulation or sexual gratification to the customer.

*Id.* at § 243.002 (West 2005). Pursuant to that authority, Houston enacted Chapter 28 of its Code of Ordinances to regulate SOBs.

In 1997, Houston enacted Ordinance 97-75, which amended Chapter 28 of the Houston Code of Ordinances. The specific part of the amended Chapter 28 at issue in this appeal is Article II, containing sections 28-81 through 28-116. Article II regulates "adult arcades." Article II defines an "adult arcade" as a business where members of the public "are admitted to use one or more arcade devices." Houston, Tex., Rev. Ordinances ch. 28, art. II, § 28-81. An "arcade device" is defined as a coin or slug operated device that dispenses entertainment intended for viewing by five or fewer persons. *Id.* Article II defines "entertainment" as:

(1)     Any live exhibition, display or performance; or

(2)     Any still picture(s) or movie picture(s), whether mechanically, electrically or electronically displayed; or

(3)     Any combination of the foregoing, in which the specified anatomical areas or specified sexual activities are depicted.

*Id.* "Specified anatomical areas" means:

Less than completely and opaquely covered:

a.     Human genitals, pubic region or pubic hair; or

b.     Buttock; or

c.     Female breast or breasts or any portion thereof that is situated below a point immediately above the top of the areola; or

d.     Any combination of the foregoing; or

2

Human male genitals in a discernibly erect state, even if completely and opaquely covered.

*Id.* "Specified sexual activities" means:

Human genitals in a state of sexual stimulation or arousal;

Acts of human masturbation, sexual intercourse or sodomy;

Fondling or other erotic touching of human genitals, pubic regions, buttock or female breast; or

Any combination thereof.

*Id.*

Article II requires that an owner or operator of an adult arcade as defined in the ordinance obtain a permit in order to operate. *Id.* at § 28-91. An adult arcade must meet certain configuration requirements in order to obtain that permit. In particular, section 28-101 requires an unobstructed line of sight from the manager's station into every area where an adult arcade customer has access. *Id.* at § 28-101(a). This unobstructed view "must be by direct line of sight from the manager's station." *Id.*

Under Chapter 28, Houston's police chief "shall grant the permit" unless (1) the adult arcade does not comply with the configuration requirements; (2) the police chief is unable to contact the applicant at the telephone number provided by the applicant to schedule and conduct the required inspection; or (3) the adult arcade had a permit revoked within the 180 days preceding the date the application was filed. *Id.* at § 28-93(b).

## II. PRIOR DECISIONS UPHOLDING ORDINANCE 97-75

Houston contends that 8100 is barred by res judicata from making its current points on appeal. Houston also argues that it does not have to prove, in every case, the negative effects of an adult video arcade. 8100 and its predecessor in interest, AVW, Inc., operated a business, originally called Adult Video Megaplexxx ("Megaplexxx"), which consisted of an adult bookstore and an adult arcade that featured small booths with doors where adult

3

customers could privately view sexually explicit videos. Megaplexxx was one of many parties that challenged the City's sexually-oriented business ordinance in 1997. The Fifth Circuit upheld the constitutionality of the amendments in *N.W. Enterprises Inc. v. City of Houston*, 352 F.3d 162 (5th Cir. 2003). The Fifth Circuit held that Ordinance 97-75 was a content neutral regulation. *Id.* at 176–77. The Fifth Circuit also determined that Ordinance 97-75 was intended to reduce negative secondary effects of SOBs including crime, disease, psychological harm to children, and reduced property values to surrounding landowners. *Id.* at 175–76. Finally, the Fifth Circuit stated that Houston "need not relitigate [the issue of secondary effects] every time its SOB ordinances are challenged." *Id.* at 176; *see also Laredo Rd. Co. v. Maverick Cnty., Tex.*, 389 F. Supp. 2d 729, 743 (W.D. Tex. 2005) (holding that county could rely on secondary effects research conducted by other localities as well as findings of secondary effects by the state legislature).

In an attempt to comply with the direct line of sight requirement, 8100 installed video cameras in each arcade booth. 8100 then applied for an Article II arcade permit, which the City denied. The denial was upheld in the trial court and on appeal, concluding that the video monitoring system did not meet the direct line of sight requirement. *Rosenblatt v. City of Houston*, 31 S.W.3d 399, 402 (Tex. App.—Corpus Christi 2000, pet. denied).[1] The court also rejected AVW's claim that the video arcade regulations were unconstitutional under the First Amendment, concluding they were barred by res judicata.

In July 2008, Houston filed suit against 8100 seeking to temporarily and then permanently enjoin 8100 from operating an adult arcade without an Article II permit. The trial court granted a temporary injunction which we upheld on appeal. *8100 N. Freeway, Ltd. v. City of Houston*, 329 S.W.3d 858 (Tex. App.—Houston [14th Dist.] 2010, no pet.). 8100 argued that the injunction constituted an unlawful prior restraint on protected First Amendment activities. We rejected that argument, but did not address the other constitutional arguments raised by 8100. *Id.* at 864–865.

---

[1] Rosenblatt was the person who made the application for the Article II permit on behalf of AVW.

### III. FACTUAL BACKGROUND

The parties stipulated that the record from the temporary injunction hearing would be incorporated into the record of the permanent injunction. In late 2008, 8100 opted to change its business model in an effort to avoid being subject to Houston's SOB ordinance. William Becker, one of 8100's owners, testified during the temporary injunction hearing. According to Becker, the changes envisioned by 8100's owners were accomplished gradually. First, 8100 changed its name to "Tryst, A Love Boutique."[2] In addition, 8100 began offering new types of inventory, including condoms, oils, lingerie, costumes, bachelorette gag gifts, adult novelties, incense, herbal supplements, and smoke accessories. 8100 also expanded the video arcade area from 9 to 28 viewing rooms. 8100 also increased the number of viewing channels to 128. Becker was asked during his testimony about the types of videos shown in 8100's arcade. Becker prefaced his testimony with the caveat: "I don't know the specifics, because I haven't been to the store for some time." Becker then went on to testify that, according to 8100's management report, out of the 128 channels, 65 to 70 offered non-adult videos while half of the remaining channels offered hard-core adult videos and the other half offered soft-core videos along the lines of "Girls Gone Wild." By making these changes, 8100 was following a strategy where it sought to recast itself as a commercial enterprise in which the primary business was not the "offering of a service or the selling, renting, or exhibiting of devices or any other items intended to provide sexual stimulation or sexual gratification to the customer." By doing this, 8100 adopted the position that it would not be required to get an Article II permit to operate. *See* TEX. LOC. GOV'T CODE ANN. § 243.002. Despite these changes, Becker testified that he would not permit his minor children to work inside the business.

---

[2] Becker's testimony regarding 8100's new name was inconsistent. At one point during the temporary injunction hearing he testified the new name was "Tryst, A Love Boutique," while later he testified that the name going on the business's street sign was "Tryst, A Lover's Boutique."

5

Matthew Dexter, a member of the Houston Police Department Vice Division, inspected the premises of 8100's business on January 16, 2009.[3] As Dexter approached the entrance into the business, he observed the following on the door: "Adult Video Megaplexxx; Open 24 hours, 7 days a week; No Minors, Alcohol, Cameras, Firearms." Upon entering the business, Dexter saw the manager/cashier station to his left, a retail area selling adult novelties, sex toys, and similar items to his right, and then the DVD area in the center of the business. According to Dexter, the arcade area was on the opposite end of the building from the entrance. As he approached the arcade area, Dexter observed and photographed a dry erase board stating: "Look, Arcade Rooms. The Nastiest and Raw Hardcore Steaming Channels!!!" Dexter also observed a flat screen television hanging on the wall above the arcade entrance displaying a sexually explicit video. Once in the arcade area, Dexter discovered three hallways with twenty-eight individual viewing booths. Each booth had an opaque door and on the door of the booth he inspected, Dexter observed this notice: "Notice. Only one person per room. All rooms are monitored by camera pursuant to City Ordinance 97-75." Inside the booth Dexter physically entered, he found an arcade device. After inserting a dollar into the machine, a sexually explicit video started playing. With the exception of one booth that was occupied, Dexter looked into each of the remaining booths and determined each contained an arcade device, a chair, paper towels, and a trash can. Officer Dexter also determined that there was not an unobstructed direct line of sight from the manager's station into each of the 28 arcade booths. Based on his inspection, Dexter concluded 8100 was operating an adult arcade without an Article II permit.

At the permanent injunction hearing, Houston stipulated that no adult arcade permit had been issued since the inception of the ordinance. While no new witnesses testified during the permanent-injunction hearing, the attorneys for the parties informed the trial

---

[3] Dexter also conducted an inspection of the premises in April, 2007; however, that inspection was part of unrelated investigations he was conducting inside the business.

court that 8100 had submitted an application for an Article II adult arcade permit on January 18, 2011, and Houston had denied that permit on February 2, 2011, because 8100 did not meet the direct line of sight requirement. The trial court granted Houston's request for a permanent injunction and entered a final judgment permanently enjoining 8100 from operating an adult arcade without an Article II permit. This appeal followed.

## IV. STANDARD OF REVIEW

We review the trial court's grant of a permanent injunction for an abuse of discretion. *CA Partners v. Spears*, 274 S.W.3d 51, 78 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). A trial court abuses its discretion when it acts arbitrarily and unreasonably, or when it misapplies the law to the established facts of the case. *Id.* The trial court does not abuse its discretion when its decision is based on conflicting evidence and some evidence in the record reasonably supports the trial court's decision. *Triantaphyllis v. Gamble*, 93 S.W.3d 398, 402 (Tex. App.—Houston [14th Dist.] 2002, pet. denied).

When a bench trial is conducted and the court does not enter findings of fact and conclusions of law to support its ruling, all facts necessary to support the judgment are implied. *BMC Software Belg., N. V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002); *Zac Smith & Co. v. Otis Elevator Co.*, 734 S.W.2d 662, 666 (Tex. 1987). Because the trial court granted Houston's request for a permanent injunction, but did not enter findings of fact and conclusions of law, we review 8100's complaints with the presumption that all findings of fact and conclusions of law were made in Houston's favor. When findings of fact and conclusions of law are not requested and none are filed by the trial court, the judgment of the trial court must be affirmed if it can be upheld on any legal theory that finds support in the evidence. *In re W. E. R.*, 669 S.W.2d 716, 717 (Tex. 1984). In an appeal from a bench trial, we do not invade the fact-finding role of the trial court, which alone determines the credibility of the witnesses, the weight to be given their testimony, and whether to accept or reject all or any part of that testimony. *Thomas v. Uzoka*, 290

7

S.W.3d 437, 452–53 (Tex. App.—Houston [14th Dist.] 2009, pet. denied).   We review a trial court's implied conclusions of law de novo.   *See BMC Software*, 83 S.W.3d at 794.

## V.   DISCUSSION

### A.   Are 8100's first two issues barred by the doctrine of res judicata?

In its first issue on appeal, 8100 argues that Article II is unconstitutionally overbroad because it sweeps within its coverage speech, specifically non-adult movies such as *Bambi*, protected by the First Amendment.   In its second issue, 8100 contends the ordinance is unconstitutional because Houston has not produced evidence of negative secondary effects from showing movies such as *Bambi* in a coin-operated arcade.   We address these issues together.

In its first two issues, 8100 recognizes that there are two types of challenges to the constitutionality of a statute or ordinance: facial challenges and as-applied challenges.   A facial constitutional challenge alleges that a statute is always unconstitutional in all its applications.   *A.H.D. Houston, Inc. v. City of Houston*, 315 S.W.3d 212, 221–22 (Tex. App.—Houston [14th Dist.] 2010, no pet.).   An as-applied challenge involves the constitutionality of the statute or ordinance applied to the particular party bringing the challenge.   *Id.* at 222.   8100 concedes in its briefing to this court that all facial challenges to Ordinance 97-75 could have been litigated in the *N.W. Enterprises* federal litigation and if they were not, they are barred by the doctrine of res judicata.   To avoid this result, 8100 asserts that its first two issues raise as-applied challenges to Article II.   8100's position is based on Officer Dexter's answers to a series of hypothetical questions posed by 8100's counsel during the temporary-injunction hearing.[4]   8100's questioning of Officer Dexter

---

[4] 8100 proceeded to ask Officer Dexter a series of hypothetical questions, the answers to which 8100 now argues on appeal bind Houston.   The questioning began with 8100's counsel asking Officer Dexter to assume that an arcade offers 128 available channels, and 127 offer G-rated movies, while only one channel offers sexually explicit videos.   8100 then asked Officer Dexter if he would conclude that arcade is an adult arcade that must have an Article II permit?   Officer Dexter answered: "Yes, sir."   Officer Dexter then continued "The primary drawing card for that arcade isn't to go watch *Barney* and *Teletubbies* and *Hannah Montana*.   The primary drawing card . . . would be for sexual activity and nothing

8

began with the following comment: "I understand you are not a lawyer. I understand what you say won't bind anybody." According to 8100, Officer Dexter's testimony revealed a new and extraordinary interpretation by Houston that Article II applies to all arcades and all content, even the movie *Bambi*. According to 8100, it could not have anticipated this new interpretation in the prior litigation involving Ordinance 97-75. 8100's argument continues with the assertion that there is no evidence of negative secondary effects associated with showing non-sexually-explicit content in video arcades. In response, Houston contends 8100's constitutional challenges to Article II are facial challenges to the basic structure of Article II that should have been raised in the *N.W. Enterprises* federal litigation and that since they were not, res judicata bars 8100 from raising them now.

Before we reach the merits of 8100's initial issues, we turn first to what effect, if any, Officer Dexter's answers to 8100's hypothetical questions has on the outcome of this appeal. We conclude that they have none. First, 8100 judicially admitted that Houston would not be bound by Officer Dexter's answers to 8100's hypothetical questions. *See Seminole Pipeline Co. v. Broad Leaf Partners, Inc.*, 979 S.W.2d 730, 740 (Tex. App.—Houston [14th Dist.] 1998, no pet.) ("A judicial admission results when a party makes a statement of fact which conclusively disproves a right of recovery or defense he currently asserts."). Even if 8100's counsel's statement does not rise to the level of a judicial admission, a plain reading of the ordinance establishes that Officer Dexter's opinion on the reach of the ordinance is simply incorrect. Article II applies only to "adult arcades," which are slug or coin operated arcades displaying specific anatomical areas or sexual activities. A court, at the trial or appellate level, is not bound by a witness's incorrect statements of the law. *See Upjohn Co. v. Rylander*, 38 S.W.3d 600, 611 (Tex.

---

else. . . . I look at the totality of the circumstances and understand that the primary drawing card of that arcade is sexual in nature and nothing else." 8100's counsel then asked: "But I understand you to say, no, that you're looking at the primary drawing card." Officer Dexter answered: "Well, in your hypothetical I would. In this particular instance, no sir. I was just looking at the arcade itself." 8100's counsel eventually asked: "But, as I understand you from your strict reading of the ordinance, an arcade would require a permit even if it showed nothing but *Bambi*?" Officer Dexter answered: "That's correct."

App.—Austin 2000, pet. denied) (stating that matters of statutory construction are questions of law for the court to decide and an expert witness may not testify regarding an opinion on a pure question of law).

We turn now to 8100's contention that its first two issues raise as-applied rather than facial challenges to Ordinance 97-75. 8100 asserts that the ordinance is unconstitutional in two ways. First, it argues the ordinance is overbroad because it requires an "'adult arcade' permit for any speech that is transmitted in a coin operated booth, whether the speech is 'adult' or otherwise." Second, 8100 argues that the ordinance is unconstitutional because there is no evidence of negative secondary effects to support such a sweeping regulation of all speech. We hold that both issues raise facial challenges to the constitutionality of Article II because they are based on the structure of Article II and the challenged provisions apply equally to all adult arcade businesses. *See A.H.D. Houston, Inc.*, 315 S.W.3d at 222 (holding that the appellant's claims present facial challenges because the challenge originates in the structure of the ordinance and would apply equally to all affected businesses).

Because 8100's first two issues are facial challenges to Article II, we address Houston's contention they are barred by the doctrine of res judicata. In *N.W. Enterprises*, the Fifth Circuit held that Ordinance 97-75 was a content neutral regulation. *N.W. Enters., Inc.*, 353 F.3d at 176–77. The Fifth Circuit also determined that Ordinance 97-75 was intended to reduce negative secondary effects of SOBs. *Id.* Finally, the Fifth Circuit held that Houston is not required to relitigate the issue of secondary effects every time its SOB ordinances are challenged in court. Because the same issues raised by 8100 in the present case were or could have been litigated in the *N.W. Enterprises* federal litigation, we hold that they are barred by the doctrine of res judicata. *See A.H.D. Houston, Inc.*, 315 S.W.3d at 222 (describing the doctrine of res judicata as barring a second action by the same parties in matters actually litigated in a prior suit as well as claims that, through the

10

exercise of due diligence, could have been litigated). We overrule 8100's first two issues on appeal.

**B.      Did the trial court abuse its discretion when it permanently enjoined 8100 from operating an adult arcade without a permit because Ordinance 97-75 gives the police unfettered discretion in the application process?**

In its third issue, 8100 contends the trial court abused its discretion when it granted Houston's request for a permanent injunction. In support of this contention, 8100 argues that Ordinance 97-75 violates the First Amendment because it allegedly gives the Houston police chief unfettered discretion when making the decision whether to issue an Article II permit to an applicant. We disagree.

Far from granting the Houston police chief unfettered discretion when making the decision on whether to issue an Article II adult arcade permit, a plain reading of Article II demonstrates that it provides narrow, objective, and definite criteria. First, Article II regulates only adult arcades and adult mini-theatres.[5] The ordinance then provides a precise definition, set out above in its entirety, of what constitutes an "adult arcade." Article II then establishes specific configuration requirements that an adult arcade must meet in order to receive a permit. This includes the requirement that there be an unobstructed line of sight from the manager's station into every area where a customer of the adult arcade has access. Article II then provides that an applicant shall receive a permit unless (1) the arcade does not comply with the visibility and lighting requirements; (2) the police chief is unable to reach the applicant at the telephone number on the application to schedule an inspection; or (3) the applicant has had a permit revoked for the same arcade within the 180-day period preceding the current application. Houston, Tex., Rev. Ordinances ch. 28, art. II, § 28-93(b). We conclude that this language gives the

___

[5] As discussed in response to 8100's first two issues on appeal, Officer Dexter's incorrect opinion that Article II also requires non-adult arcades to have a permit does not affect the outcome of 8100's third issue.

11

Houston police chief "virtually no discretion in determining what constitutes an "adult arcade" because . . . [Article II] is exacting and precise in its definitions, permit application, and denial provisions." *See Rahmani v. State*, 748 S.W.2d 618, 625 (Tex. App.—Houston [1st Dist.] 1988, pet. ref'd) (applying earlier version of ordinance in a criminal case). Under Article II, Houston's police chief "shall" grant the adult arcade permit unless one or more of the listed conditions are met. Houston, Tex., Rev. Ordinances ch. 28, art. II, § 28-93(b). Thus, there is no discretion in the permit process: either the arcade applying for the permit meets the requirements or it does not. *Rahmani*, 748 S.W.2d at 625. Because the Houston police chief's authority to grant or deny an Article II adult arcade permit is guided by narrow, precise, and definite standards, we hold that it complies with the First Amendment. S*ee SDJ, Inc. v. City of Houston*, 837 F.2d 1268, 1267–68 (5th Cir. 1988) (holding that an earlier version of ordinance complied with the First Amendment because it contained provisions where the grant of discretion was based on definitive and intelligible standards).

8100 cites two Supreme Court cases in support of its argument that Article II is unconstitutional because it allegedly gives unfettered discretion to the Houston police chief when making the decision to grant or deny an Article II permit. In *Shuttlesworth v. City of Birmingham*, the Supreme Court examined a Birmingham, Alabama city ordinance regulating parades and demonstrations on Birmingham's public streets and sidewalks. *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 149–50, 89 S. Ct. 935, 938, 22 L. Ed. 2d 162 (1969). The ordinance required anyone wishing to use a public street or sidewalk for a parade or other public demonstration to secure a permit. *Id.* The ordinance then said that once the application was submitted, the permit would be granted "unless in [the city commission's] judgment the public welfare, peace, safety, health, decency, good order, morals or convenience require that it be refused." *Id.* The Supreme Court overturned the ordinance, holding that "a municipality may not empower its licensing officials to roam essentially at will, dispensing or withholding permission to speak, assemble, picket, or parade according to their own opinions regarding the potential effect

of the activity in question on the 'welfare,' decency,' or 'morals' of the community." 394 U.S. at 153, 89 S. Ct. at 940.

In *City of Lakewood v. Plain Dealer Publishing Co.*, the City of Lakewood passed an ordinance that gave the mayor the power to grant or deny a permit to place a newspaper rack on city property. *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 753, 107 S. Ct. 2138, 2142, 100 L. Ed. 2d 771 (1988). The ordinance provided that if the mayor denied the newspaper rack application, he was required to state the reasons for the denial. *Id.* The Supreme Court overturned the ordinance holding "even if the government may constitutionally impose content-neutral prohibitions on a particular manner of speech, it may not condition that speech on obtaining a license or permit from a government official in that official's boundless discretion." 486 U.S. at 764, 108 S. Ct. at 2147.

Because Article II does not give the Houston police chief unfettered discretion when making the decision to grant or deny an adult arcade permit, we conclude that *Shuttlesworth* and *City of Lakewood* are distinguishable and do not impact our conclusion that Article II complies with the First Amendment.

The evidence established that 8100's adult arcade did not comply with the direct line of sight requirement found in Article II. In that situation, the police chief had no discretion in how to handle 8100's application for a permit: it had to be denied. The evidence also established that 8100 was operating an adult arcade without an Article II permit. Because 8100 was operating an adult arcade without an Article II adult arcade permit, we hold that the trial court did not abuse its discretion when it permanently enjoined 8100 from operating an adult arcade without an Article II adult arcade permit. *See Kubala Pub. Adjusters, Inc. v. Unauthorized Practice of Law Comm.*, 133 S.W.3d 790, 795 (Tex. App.—Texarkana 2004, no pet.) ("Where the facts conclusively show that a party is violating the substantive law, the trial court should enjoin the violation, and in such

13

a situation, there is no discretion to be exercised."). We overrule 8100's third issue on appeal.

## VI. CONCLUSION

Having overruled each of appellant, 8100 North Freeway, Ltd.'s issues on appeal, we hold that the trial court did not abuse its discretion when it permanently enjoined 8100 from operating an adult arcade without an Article II permit. Accordingly, we affirm the trial court's final judgment.

_____
Tracy Christopher
Justice

Panel consists of Chief Justice Hedges and Justices Christopher and McCally.